Yes, Your Honor. Did I get close to right? It's Kutylo, and you got DeFilippis just right. I'm sorry? I said it's Kutylo is the appellant, and you pronounced DeFilippis correctly. DeFilippis, yes. Okay, you may proceed. Thank you. Please, the Court. The first issue, obviously, is the question under Hayward of what the level of review is here, and I think that that's been pretty resoundingly resolved by decisions that have been signed onto by several of the panel members here. The Pearson, Cook, and Perl decisions, I think, are conclusive on the issue that there is a requirement for a sum evidence review. That's clearly stated in the Hayward majority opinion at 562 to 563, where it states that there's a required determination of whether the governor's decision was an unreasonable application of the California sum evidence standard or an unreasonable determination of the facts and law. Let's say that, as a given, those decisions aren't final yet, but whatever happens to them will obviously happen in this case as well. So why don't you speak to us about whether applying the purple standard here, whether we ought to reverse or affirm this, the Court? Well, this case is almost one where you don't even need to get to that issue, because one of the determinants that you have to look at is the look-through doctrine. You have to look at what's the last reason decision of the state courts. Here, there was, in the California Supreme Court, there was a summary denial. In the Court of Appeal, there was a summary denial. And in the Riverside Court, there was a, I guess, best to be called a check-the-box denial that simply… So in your view, we go to the governor's decision, right? You have to go to the governor's decision, and you have to look at it and determine, is there some evidence to support the conclusion of unreasonable risk of harm if he's released? And why do you think there wasn't? Well, the district court started off the analysis, I think, correctly. It focused on looking for evidence of current danger, talked about the crime. The district court found that the crime did not support the governor's decision, that after the passage of time, it was then 22 years at the time of the governor's decision. The crime was quite old at that point. It was a second-degree murder and had lost its probative value. And the court determined that that wasn't sufficient evidence by itself. It then looked at the next issue the governor cited, which was opposition by the district attorney. The governor relied on the fact that the district attorney was opposed to parole. Yet the district attorney at the hearing said, I have nothing adverse to say about Mr. Cotillo's suitability for parole. So the district attorney did not oppose parole, contrary to what the governor had said. So those first two issues were found to not be based on any evidence. The governor takes his evidence and he puts it on two sides of the scale, and his job is to weigh that evidence. And he takes the evidence of the crime, the district attorney's opposition, and the... But we don't really weigh, I don't think. I thought we'd go through and see whether there is any evidence supporting the governor's decision. And let's say he relies on five grounds, and it turns out four of those grounds are unsupported, but the fifth one is supported. Wouldn't that be enough to... I'm not saying that's the situation here, but don't you have to knock down each and every one of his grounds in order to... No. And that's one of the problems, is when the governor's taking items and he's putting them on one side of the scale... Why not? Do you think we weigh, or do you think we look to see if there is some evidence? You look to see if there's some evidence of each of the factors, but if it gets down to a point... Wait a minute. Some of the factors. Each of what factors? The factors that the governor cites as the basis for the denial of parole. So you think he has to have every factor correct? Not necessarily, but you do look at, is the factor... Whatever you think, just answer the question, is there some evidence? Here there is no evidence. Okay. Well, then why don't you talk about that? There's no evidence of any factor, you say? There's no evidence of any factor, but... Okay. Then why don't you address that instead of trying to show which factors have evidence, which don't? Well, I would like to hear why the factor relied upon by the governor that Mr. Cutillo did not participate in the narcotics abuse program from 1997 to 2003 is not some evidence of current dangerousness. Well, first of all, there was evidence in there that he had participated to some extent during that time. There was also evidence that he had not participated during a period of that time because of unavailability of the programs and the institutions. The board is intimately familiar with what's available and not available in the institutions. The board accepted that. Well, it was a 10-year period, and within that 10-year period, there clearly were times when the program was available and he didn't participate. But he maintained his sobriety, and that's the key important point. If he doesn't attend AA, but he maintains his sobriety, then he's simply not in need of the programming to... You mean he didn't get caught violating? You know, how do we know he maintains sobriety? If he's in a program, then we know a good bit about his behavior. Then if he doesn't, didn't he refuse a drug test at one point? Apparently that's something that's been brought up by the attorney general in the supplemental briefing, and I'm not aware of it, and this is allegedly something that occurred three years after the governor's decision. There's no evidence in the record of this. There's nothing that I can address with respect to that. All I know is that in 2003, when the governor reversed the decision, he had 22 years of sobriety. He had not... There was no evidence whatsoever that he had any problems with sobriety. His psychological reports state that he was sober. His psychological reports say that he wasn't having an active problem with drugs or alcohol, and his psychological reports don't recommend any further treatment or care. Now, the governor... Where does the governor get the authority to just say, well, I think he needs this particular type of program? If a psychologist says he's in need of programming... He's got constitutional authority under the California Constitution to make clemency decisions. So... He has the constitutional authority to evaluate whether or not this individual should get parole, but under California law, which is what's to be upheld under the due process analysis, he is to base that on evidence, and the evidence has to be... The evidence can't be speculative. The warrants decision talks about the fact that he can't speculate... You do agree that there were periods in that 10-year period... There was some time during that 10-year period where he could have... Your client could have been part of the Narcotics Anonymous. There was a program available at his institution, and he did not participate. You do agree that's the case? I don't believe that's actually the case. I don't think there's evidence in the record that says that there was programs that were available that he did not partake in. There's evidence in the record that there was programs unavailable, and he was therefore unable to partake in those programs. For some period, and then there isn't any evidence... And then there isn't any evidence... We'll ask a pause in counsel about that. What about the psychiatric reports that the governor also relied on? The governor talked about... Each and every one of them seem to say he's a risk, particularly when he uses drugs and alcohol. Each and every one of them state that he's a low risk of danger if he's released. None of them state that he's an unreasonable risk of danger, which is the standard under the regulations. And none of them say that he needs any particular treatment at that time. Now, the 1999 reports and the 2001, I think, report were the two reports that were the closest in time to the hearing at issue in 2003. And those reports, I think, are very clear in stating that Mr. Katiwa was not a danger. Mr. Katiwa was not having problems with drugs or alcohol. What about Dr. Hall, 1997? Any relapse in the lifestyle involving drugs and alcohol could jeopardize his ability to maintain socially acceptable behaviors. Absolutely. And you will see that in any report on any inmate that has ever had a drug or alcohol problem. The psychologist will always say that if they relapse, they will present an increased risk of danger beyond what the psychologist is finding. However, that is speculative to say that he's actually going to relapse. What about Dr. Metz, 1989, where under the influence of drugs, Katiwa's mild-mannered, sociable, rational Clark Kent personality has given way to a more aggressive, immature, and highly violent side of his personality? He's talking about him at the time of the crime. And at the time of the crime, that was a significant problem. And that's why doctors will always say about Mr. Katiwa or about any individual that had a drug or alcohol problem at the time that they committed their crime, which is probably the majority of them, any psychologist is going to say that if they return to drugs and alcohol, they will continue to be at risk. But that can be said about an inmate who has a problem with anger management. If he returns to his past behavior of dealing with anger, he's going to present an increased risk. If an inmate returns to his past behavior of using drugs and alcohol, he'll be an increased risk. If he returns to any of these past behaviors that he's worked on during the time that he's been in custody, he'll be an increased risk. But it's speculative and it's not evidence to say that he's going to return to that past behavior and therefore be an increased risk. I wouldn't want him released to my neighborhood. Just think about the governor's rational decision. If you're the governor, you're responsible to the people of California who have elected you. And you have to sort of put yourself in the shoes of the people in whose neighborhood the individual will come out and live. I have a hard time faulting the governor for essentially saying if my California constituents, if I'm standing in here for them and making a decision, I would think a lot of them would be unhappy about having somebody who's got these kind of risk factors be released in their neighborhood. You're not going to find a murderer in the state of California anywhere in any institution that doesn't have risk factors. They committed a murder. They are at risk of future violence, always. But the question is, have they done things while they're in custody to rehabilitate to the point where they can be safely released? That's why under 2402, there's certain things that the board is entitled to do, and they did do in this particular case. They said, we're going to impose certain conditions in order to ensure the safety of the community. We're going to have drug testing. We're going to have alcohol counseling. We're going to have these various factors that are going to ensure that Mr. Cotillo stays sober during the time that he's on supervised release. So he gets released, and he gets supervised very closely. In fact, these guys, when they leave right now, first go on electronic monitoring. They're not released just straight out into the community. They actually have an ankle bracelet placed on them. They're put out into the community, and they're slowly worked back into society. So there are factors that are done to ensure that. Thank you. You're out of time. Can I just ask one question? If we were to reverse the district court, do you agree that after Prather, the correct remedy is to remand back to the Pharrell board? No, Prather was very specific. Prather talked about reversals of board decisions, not governor's decisions. So remand to the governor? No, when the governor's decision is not supported by any evidence, the governor can't go back and look at that same record that has no evidence in it and rationally reverse it. Prather didn't say look at the same evidence. Prather said to look at subsequent developments. But that's what you do with a board hearing, not with the governor's reversal. Because there is some evidence that was submitted, and I understand it's outside this particular record, but the government, the state did cite to some subsequent behavior that would indicate that Mr. Catello's regressed to some degree. But it's my position that had this been properly done, the governor should have allowed the release to occur back in 2003. If, in fact, anything like that did happen, and I don't know that it did, that would be a parole violation. That would be dealt with by up to a year in return back to prison. It would be dealt with by drug programming and various things that the parole agent would have available to them to handle that type of a situation. And I think the law is very clear. Lawrence, which is the same court that issued Prather and Molina, has said in the Lawrence decision, directly released Ms. Lawrence as a result of the lack of evidence, didn't remand the case back to the governor. Thank you. Thank you. We'll hear from the warden. The warden's gotten attached to him, right? I'm sorry? The warden's gotten attached to Kyle. May it please the Court, Your Honor, Julie Garland on behalf of the warden. This case is guided by Supreme Court law, and no Supreme Court law authorizes relief in this case. Mr. Cutillo is asking this Court to reweigh his suitability for parole, and there is no authority in Supreme Court law or even this Court's en banc decision in Hayward that would support such an analysis. We're also bound by Pirtle and Cook. Cook. Cook. And Pearson. Pearson. There we go. The Pirtle trilogy. Those decisions, there is rehearing pending in both Pearson and Pirtle. Not in Cook. Not in Cook, correct, Your Honor. But under Supreme Court authority, and as recently reiterated in Renico v. Lett, by the Supreme Court, Supreme Court authority does not bind and does not provide a basis for relief under the AEDPA. And particularly ---- It doesn't bind the circuit? I mean, if we have the same one issue, and we decide it this week, then we ignore it next week, and we have to make the same decision afresh every week? Under the AEDPA, yes, sort of, Your Honor. And a circuit decision is certainly helpful and persuasive to the extent that it illuminates or explains Supreme Court authority. But neither of the decisions, Pearson, Pirtle, or Cook, none of those decisions do that. They don't even cite the Supreme Court authority that would stand. Well, that may be a fault in the decision, but it's still the decision. I understand the oddities of AEDPA. But it's an interesting argument because you can make the argument from the statute, certainly. But what does it mean for the court practically? We have 30 cases raising the same issue, probably more. I talked to a district judge yesterday. He says he's got 300 of them. I think the attorney general's office said there were 1,500 of them. That's correct. So you think each time we get one, we start afresh, and we ignore the 1,400 previous decisions we've issued? If those decisions relied on Supreme Court authority, no, the circuit decision would be binding on the other cases. But it's a wrong decision, so we don't rely on it. Under AEDPA, there's only relief. Relief is only available if the Supreme Court has established a rule in that context. And in this case, Greenholz is the only rule that the Supreme Court has established in the parole context. Well, obviously, we think that Greenholz doesn't mean what other people think it means. But I don't know really seriously what we're supposed to do if we have a decision the State thinks is wrong but has answered the question a week ago. Do we just ignore that? I mean, we're not allowed to ignore prior decisions, whether we like them, somebody else likes them. There must be some extent to which we're bound by last week's decision. Your Honor, our position is that unless the decision relies on Supreme Court law, this Court is not bound by it. That means, you know, I'd like to use that rule with a lot of our decisions. You think our decision is not a legitimate decision. But we're not free to say it's not a legitimate decision. I'm not saying it's not a legitimate decision. I'm saying that it's not binding on whether or not an inmate in a State parole context or in a State EDPA context is entitled to relief because the only basis for relief has to be established by the Supreme Court. And there is no Supreme Court law that is consistent or would support this Court's decision. It's interesting, but just assume that we're bound by protocol and company. And it's probably best to use the remainder of your time to argue as if we were, which, I mean, just to begin the point, at least what I've been hearing from you, is assume that we are, in fact, abusing the government's decision. And we're not looking at whether the governor's decision is supported by substantial evidence. I knew it was substantial evidence. I'm just so used to saying substantial evidence. Some evidence. Can you address that for me, please? Certainly, Your Honor. In this case, the State court upheld the governor's decision, which was based on a combination of factors. It was the gravity of the crime, his blaming of the... Now, let me just stop you. Let's take one at a time. Now, we have said that the gravity of the crime itself is not enough. Does that mean, as you read our cases, the ones that you think we should ignore, but the ones that I don't say you should consider us bound by, does that mean it never counts for anything? Or does that mean just standing alone it doesn't, whereas it can still count if coupled with something else? The gravity of the crime is a significant consideration under State law. And if that's how the court is going to look at it under Pertle, is looking at the State law. The way the State law looks at it is whether the gravity of the crime is still probative of current dangerousness based on some other factors. And here, there are those other factors. The governor was concerned about... Now, as a practical matter, somebody wouldn't be in this situation if they hadn't committed a very serious crime. So, is this case any different from any other case in terms of the gravity of the crime? Is this an extra, extra serious crime? It certainly is quite a grave crime. In this case, Mr. Cotillo arrived at his drug dealer's home to essentially seek revenge, brought two armed co-conspirators, I guess, who he refuses to identify, and went into the house and shot the drug dealer, and then... I don't mean to make light of it in the least, at least that aspect of it, but I think being in this line of work, you know that shootings among people dealing drugs are not that uncommon. It's almost a hazard of the business, right? Yes, Your Honor, and this is... I mean, there's also the girlfriend, which I think poses a different issue, but one drug dealer or one drug user or buyer shooting it out with another dealer or dealer really is... I mean, if you're in the field of serious crimes, it's pretty run-of-the-mill. Right, and the crime doesn't have to be extremely grave compared to other crimes for the governor to rely on it. In this case, his failure to participate in substance abuse certainly renders that crime even more probative, even after all these years. I was wondering about that. It is not always the case that people who deal in drugs are themselves drug users or drug addicted. In fact, my impression, I'm not... I probably have as much experience with it as, for example, you do. My impression is that the canniest drug dealers don't touch the stuff. They know better than to use it themselves. So I'm just wondering what the connection is between drug use or his own personal abuse of the drugs and the crime itself. Well, here, Your Honor, he was the drug abuser. He was the one seeking the drugs, and there's no question he had an extensive background and criminal history involved around drugs. So is the idea here that the original crime was drug motivated? Yes, Your Honor. Well, wasn't it involving... He thought that the drug deal had gone bad, and he shot the woman in the bathroom thinking she was responsible for the drug deal not going down the way it was supposed to go. That was his original claim, yes. But he was going to the home because the drug dealer refused to give him the drugs that he promised him. And so he went over there with his gun, with his two friends with their knives, to confront him about it. So it was... And then he did... and shot Ms. Lopez in the head after he shot Mr. Ladd. And he originally claimed he thought she had gone for a gun and then admitted that he just walked over to her calmly and shot her in the head. So this was... And it was directly related to his... It seems to be related to his anger about not receiving the drugs that Mr. Ladd had initially promised him. So he wasn't on drugs when he did this? I believe he admitted that he was on drugs when he did this. Okay. So was there a finding that he had been clean for 22 years? I don't believe so. There's no... He did not have any disciplinary record for abusing drugs while in prison. I don't know that... There's no way to really know that unless he's caught in the act. Right. But there was no record of that. So either he was not caught in the act or he was clean for 22 years. Correct, Your Honor. And how hard is it or difficult is it in prison to be caught in the act? I mean, isn't it... Well, certainly there are people who are caught and there are probably people who are not caught, and we don't know about that. So I guess the problem I have with the governor's decision is the only thing that really rings true about it is that he didn't actually participate in some of these programs during a period of time. And he says, well, he couldn't get in, and, you know, that they were overcrowded, you had a race to get a place. He was 50-something years old and wasn't physically able to make the race to get into the program. And the board accepted that. And then the governor sort of came back and said, well, he didn't accept it. But if, in fact, it's true that he tried to go to the programs and he couldn't get a place, isn't that troublesome that, I mean, he was attempting to get programs for it to be held against him that he couldn't get into the programs because the prisons, you know, obviously are having problems with space and funds and resources and all of that? No, Your Honor, because there's nothing in the record to support his assertion that they were unavailable, that there was strictly testimony. But he's saying it was difficult. And there's certainly in that length of time between 1997 and 2003, and Judge Kaczynski asked earlier about the availability, I certainly have never seen a case where a life inmate, you know, couldn't find substance abuse treatment for that period of time if he looked for it. And the board often made its own. Well, I thought it wasn't six years that he didn't go, was it? I thought it was just according to the governor's report, I thought it was a fairly short period that he was talking about. No, I believe it was inconsistent from 1997 to 2003. And there's also evidence in the record that the counselor, his correctional counselor was also concerned about his failure to participate. And the governor did rely on that. He raised a concern about the fact that he didn't avail himself, the counselor did, didn't avail himself of that, which also, it's not necessarily proof that it was available, but it certainly seems unlikely that the counselor would suggest that he should have been going during that time. It also is consistent with earlier psychological reports and counselor reports, saying that if he were to return to drugs, he would be, that certainly is a high-risk factor. Well, the counselor's report doesn't say he wasn't going, at least from the governor's letter. And it said that the last time he participated was January of 92, and I think the court, the board hearing was a month or two after that. The governor's letter was a year later. But the parole hearing, I think, was, when was it? It was shortly after January 92. Right, it was in 2003. No, the parole hearing. The parole hearing, I believe, was in 2003, yes. I thought it was 2002. So what's the nexus between inconsistent attendance for a period of years in the Narcotics Anonymous Program and a current threat of danger to society? Well, I think in this case, Your Honor, based on the crime being so related and caused by substance abuse, it certainly is a concern that the governor should and can consider under state law. I'd also want to point to Renico v. Lett, where the court there, Supreme Court, looked at a similar type of analysis conducted by the state court there, which was an abusive discretion standard. And the court in Renico explained how when the decision is based on sort of a general standard of review, like abusive discretion, that the court needs to be even more deferential to the state's interpretation of the record. And that, I think, applies here because the sum evidence standard is one where reasonable minds can differ about the record. And under the AEDPA, there's not a basis for relief unless it is just so egregious and there cannot be another way to interpret the record. In state law, the governor's decision is entitled to deference. He's entitled to weigh the evidence. And courts do not interfere with the weight of the evidence. Well, clearly the governor was wrong about one of his two grants. The first grant was that the DA opposed it. And the fact was the DA didn't oppose it. No, Your Honor. The governor, I certainly don't read the governor's decision as that being a basis. He simply said he agreed with the DA's letter, which identified or characterized Mr. Cotilla as still posing a moderate risk. The letter I did not see in the record that Mr. Cotilla submitted to the state courts, but there is a letter, an earlier DA letter, where they describe him as a moderate risk. The governor simply says, I concur with this evaluation, but I don't think that he's relying on the district attorney's opposition. Did Governor Gray Davis grant parole to any person who had been convicted of murder? Yes. He did? At the very end. Yes. After saying regularly that he never would. Correct. I think he granted parole to eight inmates. But the Supreme Court in the Rosencrantz case had looked at it when he had only granted parole to two inmates, and they upheld that and said that he has that right to be more cautious and more stringent in reviewing parole decisions. Except for abused women. Those are the paroles he granted. It was just before an election. If I could just address the ---- Do you have any view on Travis? Yes, Your Honor. Prather is related, or was specifically relating to a board decision and what to do when a court finds a board decision is not supported by some evidence. But even in the governor decisions, the courts in California would, the remedy at this point is to vacate the governor's decision and reinstate the board's grant. In that case, the board retains discretion and authority to review the inmate's current suitability for parole under the rescission guidelines. I do read that as applying to us. As I read Prather, and I must say I didn't spend a lot of time going over it, since it's fair reason I haven't had any briefing or anything, but I read it as an expression of the California separation of powers and allocation of authority among the three branches of government in California where the judiciary, which is part of the government of California, will not tension the authority of the executive. Does that have anything to do with us? Yes and no. We are not part of the California government. We are not in any sense responsible for or owe any particular deference to any portion of the California government as a matter of separation of powers. So does that apply to us at all? It's not binding on this Court, no. But as this Court noted in Chiolino. That's a dangerous word to say. It's like everything else is not binding on us. Well, if it is not binding, then let's say we disagree with you down the line, and we get to that point. Because if we don't, this question doesn't have any meaning. But let's say we get to that point. We disagree with you about when we said Prather was binding. We disagree with you that the governor has some evidence for the incision. And now we have to ask ourselves, what do we do? And we say, well, we're a court in California. We're part of the government of California. There is a matter of state constitutional doctrine. We owe enough deference to the parole board and presumably the governor as well to say they get a chance to do it again. It's sort of like the Supreme Court cases dealing with administrative agencies. We owe administrative agencies when we find their decisions deficient. But we don't owe anything like that. Aren't we required to set the prisoner free at that point? No, Your Honor. And when I mentioned that it was not binding, I meant in that that decision doesn't guide the remedy necessarily. Well, it does guide the remedy because this court needs to fashion a remedy that does not interfere with the state's administration of its criminal justice process, as this court noted in Chioino and the Supreme Court has noted in other cases as well. The remedy can't trample the state's rights, essentially. All right. So some of these decisions have come down and the district courts have been doing various things with them, right? Yes. Different things. Suppose we were to reverse the district court here. What does the state think is the proper remedy? That this needs to go back to the state. What do you mean the state? You mean the parole board you said before. The state's executive branch. So we would vacate the governor's decision. Reverse the district court, vacate the governor's, and send it back to the state parole board? Is that what you're saying? That's the remedy in the state. The governor's position is that it should go back to him. In this case, if it doesn't go back to him, it should at least go back to the executive branch because they are the ones vested with the parole board. The state and the governor or the governor. But you're not representing the governor. I'm not. You're representing the warden. Correct. So what's the warden's view of the proper remedy? The warden's view is that it should go back to the board, well, to the governor to vacate his decision if the court finds that he violated his due process rights. That sounds to me like even more problematic with parole versus state powers to order the governor to do something. Well, alternatively, and this is what's done in the criminal conviction context, where the liberty interest at stake is much greater, actually, it goes back to the state to correct that violation. It could go back to the state court. If the court finds that the state court unreasonably applied Supreme Court law, then tell the state court to fix that violation by remedying the violation. I think you've just shown to me why the district courts are all doing different things. It doesn't sound like there's one position as to the remedy by a federal court for the wardens. No, our position is very consistent, that it should go back to the board. Or, in this case, it's the governor. It could be either. It just occurred to me that we don't really have authority to send it any place in particular. It's like a habeas case. All we could say is that decision is vacated, and we could either say the prisoner is set free, or the state has 90 days to make another decision. And then the question of who within the state government, if we go with number two, the question of who, we can't really send it to the governor. We can't say, here, take it and put it in the governor's desk. All we can really say is, you've got 90 days to do something else, and then it would be up to the state to decide who in the state government, at that point, gets the baton, right? Correct, and that's what I was trying to say. With a conditional writ, the state gets the opportunity to fix it. If the court finds the state courts shouldn't have upheld this decision under Supreme Court law, then send it back to the state court, and the state court can issue a remedy, can vacate their decision and issue a remedy consistent with state law. And in that case, what state law is currently requiring... We can't even order the state courts to do anything. All we can do is we can either release the guy or threaten to release the guy, unless the state does something with the superior. We can't really send this back to the superior court or the Supreme Court of California and tell the Supreme Court of California, you had better enter a new decision, right? We don't have that authority. But it's not dissimilar to the criminal conviction context. If the court found that a criminal conviction had violated some clearly established law, they could vacate that decision and order the state to provide a remedial... Something happens in the states, there's usually a new trial or, you know, whatever. But we can't order the state courts to retry somebody, right? No, we say unless they try him, which means they've got to go to the superior court and institute trial proceedings. So we could do the same thing. He's released unless the state in 90 days... We can't say does something unless in 90 days... I guess the question is, unless they do what within 90 days? They provide him with due process. Now, we don't say that in a criminal case. We don't say unless you provide him with due process. We say unless you institute proceedings to try him again. But we're not... There's no trial at issue, so if... I know you're the one who brought up the analogy of the criminal trial. I mean, you don't say, we say unless you do something within 90 days. But we don't say unless you do something. We say unless you try him again. But in this context, the trial is essentially the parole hearing. It's due process in the parole context, and if he's provided, if the state provides... In any event, I think we're going to ask for briefing on what the remedy should be in a case. They'll get your opportunity to do it at length. Yes, to release him would be providing him more than the process due. He would be in a better position than he would have been had... Had he received a fair hearing. Had he received a fair hearing, had he... Because then the grant... Had he received a fair hearing, he would have been released. Well, had the state court found... This is about what the state court found, and the state court upheld it. And if the state court had found that the governor's decision violated due process, the governor or the board would have had... This would have been back to the governor or the board under state law. Okay. Thank you. Thank you, Your Honors. Would you like a minute for a moment? Thank you. I appreciate the court's indulgence in this matter. The Prather-Molina issue, I think, is the one we're talking about. I wouldn't waste too much time on the remedy until you're sure you're going to win the case. Then you might not have to worry about the remedy. Very true. The question that Judge Kuczynski has been pursuing is whether the governor's reason that he didn't participate in the Narcotics Anonymous or whatever it is program is a sufficient reason. And I think Justice Wardlaw hit the nail on the head when she said, where's the nexus between the inconsistent participation and current dangerousness? There has to be a nexus tying the inconsistent participation with current dangerousness. An inmate can have... Let me suggest to you a possibility. You've got all these psychiatrists saying, if this guy relapses, he's going to be dangerous. I'm paraphrasing, but I think that's the gist of what they're saying. There's a big risk that if he relapses to drug abuse, and then he is in prison, he's under obstruction of violence, assuming that he has the opportunity, a fair opportunity to participate in the program. If he doesn't, why is that a reason to suggest that there's somebody who's at great risk or greater risk of relapsing? Because he doesn't even have an interest in participating in this drug abuse program. A.A. and N.A. are not the only ways that individuals can attain sobriety. Individuals can attain sobriety on their own. They can attain it through religious programming. They can attain it through A.A. or N.A. There's non-secular types of programs that are starting to become available at this point, but probably weren't back then. There's a lot of different things that you can do to attain sobriety. The key question is, are you attaining sobriety? Have you maintained that sobriety? And the evidence here is unrefuted. There is nothing to show that he had any problems with sobriety in all of the, I think it was almost 24 years since the crime in 1979 up until the hearing in 2003, that showed that he had any problem. And the Lawrence decision, I don't agree with that. There's no evidence in the record, nothing before this court, that shows that he has had any problem. The only thing that's here present before this court. What can the governor say? Well, people often don't get caught. They commit violations. They don't get caught, just like any other crime. Prison crime sometimes does not get detected. And the thing about being a participant in a formal program is you have to be upfront and you have to deal with this issue in a quasi-public way. And so legal firm commitment to staying drug-free. And there's a good bit more control over the individual when you participate in a program like this than if you don't. The governor could say that an inmate may have never been caught being in a fight but may have been involved in fights. The governor can speculate about a lot of different things that may have happened. But the governor's got to rely on evidence. We know addiction is different. We know addiction is lifelong. We know addiction is often subject to relapse. And that often people don't get off it, even when they tend to stay sober for a long time, but don't actually kick addiction without the help of this kind of structure. But the proof's in the pudding. And I guess my response is simply the proof's in the pudding. The 24 years of sobriety at the time that the governor rendered his decision negates any rational inference. And that's what's talked about in the Lawrence decision. It talks about the governor has to have rational evidence. He has to have legitimate inferences that he draws from the evidence. He can't base it on guess, speculation, or conjecture. He can't just look at it and say, well, maybe this might happen in the future. What he's got to do is look at what the evidence is. And if the evidence was such that the doctors thought that Mr. Cotillo was in danger of having a problem with his sobriety, the doctors would have said he needs to have particular programming. He needs to spend time in NA or AA. They never said that. If you look at that 99 report and the 2001 report, they don't recommend any particular treatment for him. What they do is they talk about the fact that he's been programming very well in the institution. And that's what everyone talked about. Okay. Thank you. Thank you. The features argument will stand submitted. Our next here argument, United States versus
judges: Kozinski, Reinhardt, Wardlaw